**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, | |
| *Plaintiff*, | Case No. 1:25-cv-01217 |
| v. | **ORAL ARGUMENT REQUESTED** |
| UNITED STATES SOCIAL SECURITY ADMINISTRATION and UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, | |
| *Defendants*. | |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**</u>
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

    I.  DOGE and USDS's Access to SSA's Systems .......................................................... 4

    II.  Procedural History .................................................................................................. 6

        A.  FOIA Request to SSA .................................................................................... 6

        B.  Defendant SSA's Responses ......................................................................... 8

        C.  Administrative Appeal to SSA ..................................................................... 8

        D.  Litigation ..................................................................................................... 10

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

    I.  The ACLU Is Likely to Succeed on the Merits ...................................................... 11

        A.  The ACLU Is Primarily Engaged in Disseminating Information .................. 11

        B.  There Is an Urgency to Inform the Public Concerning USDS's Access
            to Defendant SSA's Systems ....................................................................... 14

    II.  The ACLU Will Suffer Irreparable Harm Absent Preliminary Relief ...................... 16

    III.  The Remaining Factors Strongly Favor the ACLU .................................................. 19

    IV.  This Court Should Waive the Bond Requirement ..................................................... 20

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ........................................................ 10

*ACLU v. Dep't of Just.,*
    321 F. Supp. 2d 24 (D.D.C. 2004) ............................................. 12, 13, 15

*Al-Fayed v. CIA,*
    254 F.3d 300 (D.C. Cir. 2001) ......................................................... 14

*Allied Progress v. Consumer Fin. Prot. Bureau,*
    No. 17-686 (CKK), 2017 WL 1750263 (D.D.C. May 4, 2017) ........................................ 11, 13

*Am. Fed'n of State, Cnty., & Mun. Emps. v. Soc. Sec. Admin.,*
    __ F. Supp. 3d __, 2025 WL 1206246 (D. Md. Apr. 17, 2025) ................................................. 1

*Am. Fed'n of State, Cnty., & Mun. Emps. v. Soc. Sec. Admin.,*
    __ F. Supp. 3d __, No. 1:25-cv-00596, 2025 WL 868953 (D. Md. Mar. 20, 2025) ......... 1, 5, 6

*Am. Fed'n of State, Cnty., & Mun. Emps. v. Soc. Sec. Admin.,*
    No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025) ...................................................... 1

*Aviel v. Gor,*
    __ F. Supp. 3d __, No. 25-778 (LLA), 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ................ 10

*Changji Esquel Textile Co. v. Raimondo,*
    40 F.4th 716 (D.C. Cir. 2022) ........................................................ 10

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ........................................................ 10

*Citizens for Responsibility & Ethics in Washington v. U.S. DOGE Serv.,*
    __ F. Supp. 3d __, No. 25-cv-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025)............... passim

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.,*
    411 F. Supp. 3d 5 (D.D.C. 2019) ............................................. 16, 18, 19

*Ctr. to Prevent Handgun Violence v. U.S. Dep't of Treasury,*
    49 F. Supp. 2d 3 (D.D.C. 1999) ........................................................ 19

*DSE, Inc. v. United States,*
    169 F.3d 21 (D.C. Cir. 1999) ........................................................ 20

*Dunlap v. Presidential Advisory Comm'n on Election Integrity,*
    286 F. Supp. 3d 96 (D.D.C. 2017) ........................................................ 16

*Elec. Priv. Info. Ctr. v. Dep't of Just.*,
　416 F. Supp. 2d 30 (D.D.C. 2006) ................................................................. 16

*Energy Pol'y Advocs. v. U.S. Dep't of the Interior*,
　No. 21-1247 (JEB), 2021 WL 4306079 (D.D.C. Sept. 22, 2021)........................... 13

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
　636 F.2d 755 (D.C. Cir. 1980) ...................................................................... 20

*Hanson v. District of Columbia*,
　120 F.4th 223 (D.C. Cir. 2024) ..................................................................... 19

*Karem v. Trump*,
　960 F.3d 656 (D.C. Cir. 2020) ...................................................................... 10

*Landmark Legal Found. v. EPA*,
　910 F. Supp. 2d 270 (D.D.C. 2012) ............................................................... 13

*League of Woman Voters of U.S. v. Newby*,
　838 F.3d 1 (D.C. Cir. 2016) ................................................................... 16, 19

*Loving v. IRS*,
　917 F. Supp. 2d 67 (D.D.C. 2013) ................................................................. 19

*Luokung Tech. Corp. v. Dep't of Def.*,
　538 F. Supp. 3d 174 (D.D.C. 2021) ............................................................... 19

*Nat'l Archives & Records Admin. v. Favish*,
　541 U.S. 157 (2004)................................................................................... 18

*NLRB v. Robbins Tire & Rubber Co.*,
　437 U.S. 214 (1978)................................................................................... 19

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.*,
　263 F. Supp. 3d 293 (D.D.C. 2017) ...................................................... 11, 13, 15

*Protect Democracy Project, Inc. v. U.S. Dep't of Just.*,
　498 F. Supp. 3d 132 (D.D.C. 2020) ......................................................... passim

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*,
　489 U.S. 749 (1989)................................................................................... 19

**Statutes**

20 C.F.R. § 402.105(b)..................................................................................... 9

20 C.F.R. § 402.65(a)....................................................................................... 8

20 C.F.R. § 402.80(d)(1)(ii) ............................................................................... 9

20 C.F.R. § 402.85(b) ................................................................................................ 8, 9

42 U.S.C. § 1306(c) ..................................................................................................... 8

5 U.S.C. § 552(a)(4)(A)(ii)–(iii) ................................................................................. 7

5 U.S.C. § 552(a)(6)(E)(i) .......................................................................................... 11

5 U.S.C. § 552(a)(6)(E)(iii) ........................................................................................ 11

5 U.S.C. § 552(a)(6)(E)(v) .................................................................................... 11, 14

5 U.S.C. § 552(a)(6)(E)(v)(II) .................................................................................... 7

**Other Authorities**

Anna Bower, *On DOGE, Directives, and DOJ*, Lawfare (Apr. 27, 2025) ...................... 3

Carolyn Puckett, *The Story of the Social Security Number*, Soc. Sec. Bull., July 2009 ................ 5

Chas Danner, *All the Federal Agencies DOGE Has Broken Into*, N.Y. Mag. (Feb. 10, 2025) .............................................................................................................................. 4

Daniella Genovese, *Social Security Administration Launches Anti-Fraud Measures*, Fox Bus. (Apr. 14, 2025) ............................................................................................... 17

Fatima Hussein, *Tens of Millions of Dead People Aren't Getting Social Security Checks, Despite Trump and Musk Claims*, Associated Press (Feb. 19, 2025) ......................... 2

H.R.Rep. No. 104–795, 1996 U.S.C.C.A.N. 3448 ...................................................... 11

Hannah Natanson & Lisa Rein, *Inside DOGE's Push to Defy a Court Order and Access Social Security Data*, Wash. Post (Apr. 15, 2025) ............................................... 2, 6

Hannah Natanson & Lisa Rein, *Social Security Abandons DOGE-Led Phone Service Cuts Amid Chaos, Backlash*, Wash. Post (Apr. 9, 2025) .................................................. 18

Hannah Natanson et al., *DOGE Aims to Pool Federal Data, Putting Personal Information at Risk*, Wash. Post (May 7, 2025) ................................................................ 2

Isaac Stanley-Becker et al., *Musk's DOGE Agents Access Sensitive Personnel Data, Alarming Security Officials*, Wash. Post (Feb. 6, 2025) ......................................... 5

Jackie Velez, *DOGE Changes at the Social Security Administration Draw Lawsuit from Disability Advocates*, Tex. Pub. Radio (Apr. 14, 2025) ......................................... 17

Kate Conger et al., *Musk Allies Discuss Deploying A.I. to Find Budget Savings*, N.Y. Times (Feb. 3, 2025) ................................................................................................. 5

Lisa Rein, Hannah Natanson & Elizabeth Dwoskin, *Social Security Website Keeps Crashing, as DOGE Demands Cuts to IT Staff*, Wash. Post (Apr. 7, 2025) .......................... 17

Lorie Konish, *Court Blocks DOGE Access to Sensitive Personal Data at Social Security Administration*, CNBC (Apr. 21, 2025) ................................................................... 17

Lorie Konish, *Trump Administration's Appeal of a Temporary Restraining Order Preventing DOGE Access to Social Security Data Is Denied*, CNBC (Apr. 2, 2025) ............ 17

Makena Kelly, *DOGE Plans to Rebuild SSA Code Base in Months, Risking Benefits and System Collapse*, Wired (Mar. 28, 2025) ...................................................... 17

Meryl Kornfield, Lisa Rein & Hannah Natanson, *When Government Thinks You're Dead, It Upends Lives. DOGE May Make It Worse.*, Wash. Post (Apr. 23, 2025) ....................... 3, 17

Meryl Kornfield, *Senate Democrats Ask for Answers from Inspector General on Social Security Cuts*, Wash. Post (Apr. 23, 2025) .............................................. 18

Michael Sainato, *Doge's Attack on Social Security Causing 'Complete, Utter Chaos,' Staff Says*, Guardian (Apr. 6, 2025) ...................................................... 17

Nate Raymond, *US Appeals Court Will Not Allow DOGE to Access Social Security Data*, Reuters (Apr. 30, 2025) ............................................................... 17

Press Release, Soc. Sec. Admin., Statement from Lee Dudek, Acting Commissioner, about Commitment to Agency Transparency and Protecting Benefits and Information (Feb. 19, 2025) ....................................................................... 5

Robert Tait, *Former US Social Security Head Predicts 'Interruption of Benefits' Amid Doge Cuts*, Guardian (Apr. 25, 2025) .................................................. 17

Sahil Kapur & Julie Tsirkin, *Top Republicans Say They're Out of the Loop as DOGE Downsizes Social Security Administration*, NBC (Mar. 26, 2025) ..................... 3, 18

Shelby Talcott, *DOGE Follows Longtime Musk Pattern — and Turns Attention to Social Security Administration*, Semafor (Feb. 6, 2025) .............................. 4

Soc, Sec. Admin., *How Much Will the COLA Amount Be for 2025 and When Will I Receive It?* (Oct. 10, 2024) ........................................................ 5

Stephen Fowler & Jenna McLaughlin, *DOGE Says It Needs to Know the Government's Most Sensitive Data, but Can't Say Why*, NPR (Mar. 26, 2025) .................... 17

Stephen Fowler & Jude Joffe-Block, *How DOGE May Have Improperly Used Social Security Data to Push Voter Fraud Narratives*, NPR (Apr. 11, 2025) .......... 2, 17, 18

**Rules**

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025)......................................... 4

## INTRODUCTION

The Social Security Administration ("SSA") controls sensitive and personal financial data, including medical, work, and pay records. It has data on everyone who has a Social Security number, everyone who has Medicare, and everyone who has applied for Supplemental Security Income. As recently described by Judge King of the U.S. Court of Appeals for the Fourth Circuit, writing for himself and six other members of the *en banc* court, "all this highly sensitive personal information has long been handed over to SSA by the American people with every reason to believe that the information would be fiercely protected . . . because 'virtually from its inception, SSA has been guided by an abiding commitment to the privacy and confidentiality of the personal information entrusted to it by the American people.'" *Am. Fed'n of State, Cnty., & Mun. Emps. v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *2 (4th Cir. Apr. 30, 2025) (en banc) (King, J., concurring in denial of motion for stay) (quoting *Am. Fed'n of State, Cnty., & Mun. Emps. v. Soc. Sec. Admin.*, __ F. Supp. 3d __, 2025 WL 1206246, at *3 (D. Md. Apr. 17, 2025)).

Access to this sensitive information by the so-called Department of Government Efficiency ("DOGE") and the United States DOGE Service ("USDS") has raised serious concerns about whether USDS access to or use of these sensitive records violates federal privacy protections, whether government actors are outsourcing important and complex decision-making to black-box AI algorithms, and whether feeding people's sensitive information to insufficiently trained USDS personnel and unvetted AI systems further risks compromising Americans' privacy. In a recent opinion barring USDS personnel's access to SSA systems, Judge Hollander of the U.S. District Court for the District of Maryland wrote that USDS "is essentially engaged in a fishing expedition at SSA . . . thereby exposing personal, confidential, sensitive, and private information that millions of Americans entrusted to their government." *Am. Fed'n of State, Cnty., & Mun. Emps. v. Soc. Sec. Admin.*, __ F. Supp. 3d __, No. 1:25-cv-00596, 2025 WL 868953, at *68 (D. Md. Mar. 20, 2025).

After Judge Hollander barred the SSA from granting access, USDS personnel reportedly went to great lengths to attempt to circumvent the court order,[1] but the extent to which USDS continues to seek access to SSA data in contravention with the court's order is unclear.[2] Just this morning, the *Washington Post* reported that a USDS official "told staffers at the Social Security Administration that they would soon start linking various sources of Social Security data for access and analysis, . . . with a goal of 'joining all data across government.'"[3] But because "DOGE has also sometimes removed protections around sensitive information — on Social Security numbers, birth dates, employment history, disability records, medical documentation," the "administration's moves ramp up the risk of exposing data to hackers and other adversaries" and raises concerns "that the data assembled under DOGE could be used against political foes or for targeted decisions about funding or basic government services."[4]

USDS's extraordinary access to SSA systems has already impacted the lives of millions of Americans, all while USDS operates in secrecy with its "move fast and break things" approach. USDS has used SSA data to peddle debunked claims of dead people receiving Social Security payments and noncitizens voting—not only misusing this information, but also showing how USDS personnel might not understand the technical details of the data.[5] USDS has also used its

---

[1] Hannah Natanson & Lisa Rein, *Inside DOGE's Push to Defy a Court Order and Access Social Security Data*, Wash. Post (Apr. 15, 2025), https://perma.cc/F2GR-46FR.

[2] Stephen Fowler & Jude Joffe-Block, *How DOGE May Have Improperly Used Social Security Data to Push Voter Fraud Narratives*, NPR (Apr. 11, 2025), https://perma.cc/A4N9-L4L9.

[3] Hannah Natanson et al., *DOGE Aims to Pool Federal Data, Putting Personal Information at Risk*, Wash. Post (May 7, 2025), https://perma.cc/X5QL-E22E.

[4] *Id.*

[5] *See* Fatima Hussein, *Tens of Millions of Dead People Aren't Getting Social Security Checks, Despite Trump and Musk Claims*, Associated Press (Feb. 19, 2025) https://perma.cc/K3UH-Z876; Fowler & Joffe-Block, *supra*.

access to move millions of Social Security numbers to the SSA Death Master File, resulting in individuals seeing "their bank accounts closed, tax returns rejected, Medicare and Medicaid coverage stopped, and government benefits halted," as well as losing their credit history and being removed from their state's voter rolls.[6] And as USDS makes hasty technical changes purportedly for fraud prevention purposes, the SSA website has crashed multiple times and phone wait times have ballooned, making it harder for millions of Americans to access their benefits.[7] Yet the American public continues to be kept in the dark.[8] There is an urgent need for transparency as to what USDS and associated personnel have access to and what they plan to do.

Plaintiff American Civil Liberties Union ("ACLU") seeks expedited processing of its Freedom of Information Act ("FOIA") request (the "Request") for records relating to USDS accessing sensitive information controlled by Defendant SSA. The Request seeks records concerning USDS's access to such data and any agency consideration of whether that access is prohibited or constrained by law, as well as any use of artificial intelligence to analyze SSA's records or data.

The ACLU seeks a preliminary injunction ordering SSA to grant the ACLU's request for expedited processing and to fully process and produce all non-exempt records on an expedited basis. The ACLU meets the requirements for a preliminary injunction because it is likely to succeed

---

[6] Meryl Kornfield, Lisa Rein & Hannah Natanson, *When Government Thinks You're Dead, It Upends Lives. DOGE May Make It Worse.*, Wash. Post (Apr. 23, 2025), https://perma.cc/MN48-A5ZA.

[7] Beatrice Nolan, *Elon Musk's DOGE Is Undermining the Social Security Administration's Technology and Operations, Former White House Official Says*, Fortune (Apr. 1, 2025), https://perma.cc/8TYS-UY5N.

[8] *See* Sahil Kapur & Julie Tsirkin, *Top Republicans Say They're Out of the Loop as DOGE Downsizes Social Security Administration*, NBC (Mar. 26, 2025), https://perma.cc/3T9Z-B8NS; Anna Bower, *On DOGE, Directives, and DOJ*, Lawfare (Apr. 27, 2025), https://perma.cc/7KH5-SNFU.

in its request for expedited processing, it will suffer irreparable harm absent a preliminary injunction, and the balance of the equities and the public interest weigh in favor of granting relief. This Court recently issued a preliminary injunction granting expediting processing of another FOIA request concerning DOGE. *Citizens for Responsibility & Ethics in Washington v. U.S. DOGE Serv.*, __ F. Supp. 3d __, No. 25-cv-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) [hereinafter *CREW*]. The same relief is warranted here.

## BACKGROUND

### I.    DOGE and USDS's Access to SSA's Systems

On January 20, 2025, President Donald Trump issued an executive order establishing DOGE, renaming the United States Digital Service as the "United States DOGE Service," and establishing a temporary organization, "the U.S. DOGE Service Temporary Organization" (collectively referred to as "USDS"). Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). The executive order directs USDS to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Id.* § 4. It also instructs government agency heads to "take all necessary steps . . . to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b).

In the days and weeks following the executive order, numerous outlets reported that individuals affiliated with or representing USDS, who lacked training and qualifications to handle highly sensitive data, had requested or gained access to government data systems across agencies—including Defendant SSA's systems.[9] Additional reports have indicated that individuals

---

[9] *See, e.g.*, Chas Danner, *All the Federal Agencies DOGE Has Broken Into*, N.Y. Mag. (Feb. 10, 2025), https://perma.cc/535H-U9KZ; Shelby Talcott, *DOGE Follows Longtime Musk Pattern — and Turns Attention to Social Security Administration*, Semafor (Feb. 6, 2025), https://perma.cc/RF39-FH5G; Isaac Stanley-Becker et al., *Musk's DOGE Agents Access Sensitive*

associated with USDS have proposed or implemented programs to use artificial intelligence to analyze large volumes of federal government records for purposes including purportedly identifying potential redundancies and budget reductions.[10] In February, SSA Acting Commissioner Lee Dudek confirmed reports that Defendant SSA had granted USDS access to SSA data systems.[11] In a press release, Acting Commissioner Dudek stated that USDS personnel were working with SSA and that USDS had "read" access to SSA systems.[12]

Defendant SSA controls sensitive personal and financial data, including "Social Security numbers, medical records, mental health records, hospitalization records, drivers' license numbers, bank and credit card information, tax information, income history, work history, birth and marriage certificates, and home and work addresses." *Am. Fed'n of State, Cnty., & Mun. Emps.*, 2025 WL 868953, at *68. It has data on everyone who has a Social Security number, everyone who has Medicare, and everyone who has applied for Supplemental Security Income. About 72.5 million people receive Social Security benefits,[13] and every U.S. citizen, lawful permanent resident, and visa holder with work authorization is issued a Social Security number.[14] Because of the extraordinary harm that unauthorized access to and use of SSA records can cause, a federal judge

---

*Personnel Data, Alarming Security Officials*, Wash. Post (Feb. 6, 2025), https://perma.cc/Z33J-AFNR.

[10] *See, e.g.*, Kate Conger et al., *Musk Allies Discuss Deploying A.I. to Find Budget Savings*, N.Y. Times (Feb. 3, 2025), https://perma.cc/VU8Z-BKK7.

[11] Press Release, Soc. Sec. Admin., Statement from Lee Dudek, Acting Commissioner, about Commitment to Agency Transparency and Protecting Benefits and Information (Feb. 19, 2025), https://perma.cc/JV8S-UMTT.

[12] *Id.*

[13] Soc. Sec. Admin., *How Much Will the COLA Amount Be for 2025 and When Will I Receive It?* (Oct. 10, 2024), https://perma.cc/26HN-HAA7.

[14] *See* Carolyn Puckett, *The Story of the Social Security Number*, Soc. Sec. Bull., July 2009, at 55, 55, 64, 71, https://www.ssa.gov/policy/docs/ssb/v69n2/ssb-v69n2.pdf.

has barred USDS access to SSA records in a lawsuit alleging violation of the Privacy Act and other federal data privacy and security laws. *Am. Fed'n of State, Cnty., & Mun. Emps.*, 2025 WL 868953, at *69. In granting a temporary restraining order, the court explained that

> SSA provided members of the SSA DOGE Team with unbridled access to the personal and private data of millions of Americans, including but not limited to Social Security numbers, medical records, mental health records, hospitalization records, drivers' license numbers, bank and credit card information, tax information, income history, work history, birth and marriage certificates, and home and work addresses.
>
> Yet, [the SSA] never identified or articulated even a single reason for which the DOGE Team needs unlimited access to SSA's entire record systems, thereby exposing personal, confidential, sensitive, and private information that millions of Americans entrusted to their government.

*Id.*

And yet, following issuance of that order, reports indicate that USDS "sought for weeks to get around a court order barring their access to sensitive data and internal systems at the Social Security Administration, prompting career staff to repeatedly resist their efforts."[15] Despite the extraordinary public interest in understanding the scope of USDS's attempted and actual access to SSA records, many critical questions remain unanswered.

## II.    Procedural History

### A.    FOIA Request to SSA

On February 7, 2025, the ACLU submitted the Request to more than 40 federal government agencies, including Defendant SSA, seeking records pertaining to USDS access to government database systems. Wessler Decl. ¶ 6; Wessler Decl. Ex. A.

The Request sought expedited processing on the grounds that there was a "compelling need" for the information because the records requested were "urgen[tly]" needed by an

---

[15] Hannah Natanson & Lisa Rein, *Inside DOGE's Push to Defy a Court Order and Access Social Security Data*, Wash. Post (Apr. 15, 2025), https://perma.cc/F2GR-46FR.

organization that is primarily engaged in disseminating information about "Federal Government activity." Wessler Decl. Ex. A at 5 (quoting 5 U.S.C. § 552(a)(6)(E)(v)(II)); Wessler Decl. ¶ 7. The Request explained that the ACLU is an organization "primarily engaged in disseminating information" about "Federal Government activity" because it regularly publishes and disseminates information it obtains through ACLU magazine issues, press releases, reports, blog posts, videos, podcasts, and other multimedia projects. Wessler Decl. Ex. A at 5–9. The Request further explained that there is an urgent need for the information because the records sought relate to a matter of widespread and exceptional media and public interest in USDS access to federal agency systems containing sensitive information, and whether USDS access to or use of these sensitive records violates federal privacy protections. *Id.* at 3–4, 9–10.

The Request also sought a fee waiver or limitation of fees on the grounds that: (1) disclosure of the requested records is in the public interest because it is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester"; and (2) the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. Wessler Decl. ¶ 8 (quoting 5 U.S.C. § 552(a)(4)(A)(ii)–(iii)); Wessler Decl. Ex. A at 8.

A number of agencies in receipt of the ACLU's Request granted expedited processing and a fee waiver. Agencies granting expedited processing, either initially or on appeal, include the Department of Commerce, Department of Defense, Department of Education, Department of Health and Human Services, Centers for Medicare and Medicaid Services, Centers for Disease Control and Prevention, Department of Homeland Security, Federal Emergency Management Agency, General Services Administration, Internal Revenue Service, and Office of Personnel Management. Wessler Decl. ¶ 9.

### B.    Defendant SSA's Responses

On February 13, 2025, Defendant SSA denied the ACLU's requests for expedited processing and a fee waiver. Wessler Decl. ¶ 10; Wessler Decl. Ex. B. With respect to the expedited processing request, SSA stated that it denied the ACLU's request because it did not fall under the category for "when the requester is primarily engaged in disseminating information, and shows an urgency to inform the public about actual or alleged government activities." Wessler Decl. Ex. B at 2; Wessler Decl. ¶ 11. With respect to the fee waiver, Defendant SSA stated that it denied the ACLU's request because it failed to meet the following factors listed in 20 C.F.R. § 402.85(b) for determining whether a disclosure is in the public interest:

> (1) how the records pertain to the Federal government's operations or activities;
>
> (2) whether disclosure would reveal any meaningful information about government operations or activities not already known to the public; and
>
> (3) whether the contribution to public understanding would be significant.

Wessler Decl. Ex. B at 2–3; Wessler Decl. ¶ 12. Defendant SSA also invoked section 1106(c) of the Social Security Act, 42 U.S.C. § 1306(c), which "permits the agency to charge the full cost to process requests for information for purposes not directly related to the administration of program(s) under the Social Security Act" and stated an intent to charge the ACLU for the full cost of search and reproduction of records. Wessler Decl. Ex. B at 3; Wessler Decl. ¶ 12.

### C.    Administrative Appeal to SSA

On March 24, 2025, the ACLU appealed the denials of expedited processing and fee waiver. Wessler Decl. ¶ 13; Wessler Decl. Ex. C. The ACLU's appeal explained that its request was entitled to expedited processing because "the requestor is primarily engaged in disseminating information, and shows an urgency to inform the public about the actual or alleged government activities." Wessler Decl. Ex. C. at 1–8 (quoting 20 C.F.R. § 402.65(a)); Wessler Decl. ¶ 14. The

ACLU reiterated its explanation in its Request about the degree to which it is engaged in disseminating information to the public. Wessler Decl. Ex. C at 2. And the ACLU addressed the extraordinary public interest in the subject of its Request, including by citing to 60 press articles on the topic, Wessler Decl. Ex. C at 2–6 nn.1–7 (citing 44 press articles and citing FOIA request, which itself cited 16 additional press articles); Ex. A at 3–4, 9–10 nn.2–3, 11–12 (citing 16 press articles), and to pending litigation, statements of concern from members of Congress, and other sources. Wessler Decl. Ex. C at 5–7 n.6, 9–12.

The ACLU also explained that its request was entitled to a fee waiver because the Request satisfied the criteria set out in the SSA's FOIA regulations, 20 C.F.R. § 402.85(b), inasmuch as the requested records: (1) relate to Defendant SSA's operations as they pertain to USDS access to sensitive information; (2) would reveal meaningful information about government activity that the public has little to no information about; and (3) would be significantly contribute to the public's understanding of USDS, because so little information is known. Wessler Decl. Ex. C at 8–10; Wessler Decl. ¶ 15. The appeal further explained that the authority under section 1106(c) does not apply to the ACLU's Request because it seeks records "directly related to the administration of a program under the [Social Security] Act for which SSA has responsibility." Wessler Decl. Ex. C at 10 (quoting 20 C.F.R. § 402.80(d)(1)(ii)); Wessler Decl. ¶ 16.

On March 25, 2025, Defendant SSA acknowledged receipt of the appeal and provided a tracking number. Wessler Decl. ¶ 17. Defendant SSA did not provide an acknowledgement pursuant to 20 C.F.R. § 402.105(b) that the appeal would take longer than ten working days. *Id.* On April 18, 2025, the ACLU emailed Defendant SSA asking for a status update about its appeal. *Id.* ¶ 18; Wessler Decl. Ex. E. Three days later, Defendant SSA responded via email that the appeal is "currently being processed." Wessler Decl. Ex. F; Wessler Decl. ¶ 19.

###### D.    Litigation

Twenty-two days after submitting the appeal to SSA, on April 21, 2025, the ACLU filed suit against SSA and the Department of Veterans Affairs ("VA") in this Court. Corrected Compl., ECF No. 6-1. The suit seeks, *inter alia*, an order compelling expedited processing of the request and prohibiting the agencies from charging fees. *Id.* at 15.

On April 25, 2025, the VA responded to the Request via email, stating that the agency had commenced search for and processing of records, and granting the ACLU's request for fee waiver. Wessler Decl. ¶ 21. Via the same communication, the VA released 18 pages of responsive records, and stated that "more pages [are] to be released in the future." *Id.*

However, to date, SSA has not provided a determination on the ACLU's appeal. Wessler Decl. ¶ 20. Nor has the agency produced any responsive records. *Id.*

### LEGAL STANDARD

To warrant a preliminary injunction, a plaintiff must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially insure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). When the government is the opposing party, the balance of equities and public interest factors merge. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). Courts in this circuit apply a "'sliding scale' approach under which 'a strong showing on one factor could make up for a weaker showing on another.'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (noting tension with Supreme Court decisions but reserving the question of "whether the sliding-scale approach remains valid); *see also Aviel v. Gor*, __ F. Supp. 3d __, No. 25-778 (LLA), 2025 WL 1009035, at *5 (D.D.C. Apr. 4, 2025) (noting that the D.C. Circuit has yet to decide the question).

## ARGUMENT

### I.    The ACLU Is Likely to Succeed on the Merits

Under FOIA, a party seeking expedited processing must demonstrate a "compelling need" or show that it qualifies under another ground set out by the relevant agency. 5 U.S.C. § 552(a)(6)(E)(i). As relevant here, the statute defines "compelling need" to mean, "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." *Id.* § 552(a)(6)(E)(v). Courts review denials of expedited processing "based on the record before the agency at the time of the determination." *Id.* § 552(a)(6)(E)(iii). The ACLU's Request demonstrates a "compelling need" because it shows that the ACLU is "primarily engaged in disseminating information" and that there is an urgency to inform the public about Defendant SSA's activity related to USDS's access to sensitive data. There is thus a substantial likelihood of success on the merits.

### A.    The ACLU Is Primarily Engaged in Disseminating Information

Disseminating information to the press and to the public is critical to the ACLU's work and among its primary activities. The standard for whether a requester is "primarily engaged in disseminating information" "requires that information dissemination be the main [and not merely an incidental] activity of the requestor." *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (alteration in original) (quoting *Allied Progress v. Consumer Fin. Prot. Bureau*, No. 17-686 (CKK), 2017 WL 1750263, at *3 (D.D.C. May 4, 2017). The standard does *not* require that information dissemination be the requester's "sole occupation." *Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132, 139 (D.D.C. 2020); *accord* H.R.Rep. No. 104–795, at 26, 1996 U.S.C.C.A.N. 3448, 3469.

As explained exhaustively in the Request, dissemination of information about actual or alleged government activity is a critical and substantial component of—and far from incidental

to—the ACLU's mission and work. The ACLU regularly obtains information about government activity, analyzes that information, and widely publishes and disseminates it to the press and public. Wessler Decl. Ex. A at 5; Wessler Decl. ¶¶ 3–4; *see ACLU v. Dep't of Just.*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding a nonprofit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information"). The ACLU regularly publishes its *ACLU* magazine, which reports on and analyzes current events related to civil liberties, to over one million recipients. Wessler Decl. Ex. A at 5. The ACLU also publishes regular updates and alerts via email to 4.8 million subscribers and via social media to over 6.6 million followers. Wessler Decl. Ex. A at 5–6; *cf. Protect Democracy Project*, 498 F. Supp. 3d at 139 (noting the plaintiff's "email list of approximately 30,000 people" and Twitter account with "more than 36,000 followers"). In addition, the ACLU creates and publishes original editorial and educational content on its website, including blog posts, "know your rights" materials, fact sheets, educational brochures and pamphlets, videos, podcasts, and other multimedia projects. Wessler Decl. Ex. A at 7–8.

This dissemination of information frequently includes documents and analysis of information that the ACLU has obtained through FOIA requests, a fact this Court recently found persuasive in granting expedited processing to another public interest organization seeking records related to USDS and DOGE. *CREW*, 2025 WL 752367, at *13 (noting that the plaintiff "routinely disseminates information obtained through FOIA to the public" (citation omitted)). The ACLU informs the public and the press about such documents and analysis through its magazine, email updates, social media alerts, press releases, reports about government conduct and civil liberties issues, and website. Wessler Decl. Ex. A at 6–8. ACLU attorneys are also interviewed frequently

for news stories about documents released through FOIA requests by the ACLU. *Id.* The ACLU's plans for the records sought by the Request are no different; as stated in the Request, it "plans to analyze, publish, and disseminate to the public the information gathered through this Request." *Id.* at 9.

Courts in this district have routinely found organizations like the ACLU to be "primarily engaged in disseminating information." *See, e.g.*, *CREW*, 2025 WL 752367, at *13; *Protect Democracy Project*, 498 F. Supp. 3d at 139; *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 98 (D.D.C. 2020); *Protect Democracy Project*, 263 F. Supp. 3d at 298; *ACLU*, 321 F. Supp. 2d at 29 n.5. The Request's extensive detail about the myriad of ways in which disseminating information is critical to the ACLU's work distinguishes this action from those where courts have ruled that organizations have not established that they were "primarily engaged in disseminating information." *See, e.g.*, *Energy Pol'y Advocs. v. U.S. Dep't of the Interior*, No. 21-1247 (JEB), 2021 WL 4306079, at *3 (D.D.C. Sept. 22, 2021) (finding that the plaintiff's FOIA request contained only "conclusory assertions" that told "nothing specific about [the plaintiff's] primary function"); *Allied Progress*, 2017 WL 1750263, at *4 (finding the "only indicia in the FOIA request" to be a statement in the fee waiver section that the plaintiff would make the records sought available on its website and use the information not educate the public). The record established by the Request shows that the ACLU is not just "any organization with a website, newsletter, or other information distribution channel," *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 276 (D.D.C. 2012), but an organization that disseminates information, including information obtained under FOIA, as a substantial and primary part of its work.

13

### B.    There Is an Urgency to Inform the Public Concerning USDS's Access to Defendant SSA's Systems

The Request shows that there is an "urgency to inform the public concerning actual or alleged Federal Government activity," 5 U.S.C. § 552(a)(6)(E)(v). In the D.C. Circuit, courts consider the following factors in evaluating this question: "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." *Protect Democracy Project*, 498 F. Supp. 3d at 139–40 (quoting *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001)).

As to the first factor, the records sought by the Request relate to a matter of widespread and exceptional public and media interest—namely, USDS access to sensitive personal information, any use of that information, and whether USDS access to this data violates federal privacy protections. Wessler Decl. Ex. A at 10. As this Court observed in *CREW*, "USDS's structure and operations doubtless 'concern a matter of current exigency' to the public." 2025 WL 752367, at *13. USDS's operations with Defendant SSA should similarly be treated as a "matter of current exigency to the American public." There have been "multiple new breaking news stories published daily, including about USDS access to sensitive information." Wessler Decl. Ex. A at 3–4, 9–10 nn.2–3, 11–12 (citing 16 press articles); Wessler Decl. Ex. C at 2–6 nn.1–7 (citing 44 press articles); Natanson, *supra* note 3 (May 7, 2025, article renewing concerns about USDS access to SSA and other agencies' sensitive data); *see CREW*, 2025 WL 752367, at *13 ("USDS has been the subject of numerous news articles . . . ."). Members of Congress have raised alarms. *See* Wessler Decl. Ex. A at 10 n.14. And organizations, as well as private citizens, have alleged violations of federal data privacy and security requirements. *See* Wessler Decl. Ex. A at 10 n.13; Wessler Decl. Ex. C at 5 n.6.

As the ACLU stated in its Request, "[a]n extraordinary debate about unprecedented activity within federal agencies is happening now, and accurate public information about agency activities is urgently needed to inform that debate." Wessler Decl. Ex. A at 10. By the time of the Request, there were already numerous press reports of USDS requesting or gaining access to federal agency systems, *id.* at 2, and the public urgently needs information to understand this highly consequential and fast-moving situation. *Cf., e.g.*, *ACLU*, 321 F. Supp. 2d at 30 ("Because the records that plaintiffs seek relate to current surveillance efforts, the potential invasion of the public's privacy interests is of immediate concern, weighing in favor of expediency."); *Protect Democracy Project*, 498 F. Supp. 3d at 140 (finding that the public urgently needed to know, given an impending election and already ongoing mail-in voting, whether the U.S. Postal Service was fulfilling its role to enable a free and fair election and whether the U.S. Department of Justice was obstructing those efforts).

Second, a delay in response "would compromise a significant recognized interest" because "stale information is of little value." *Protect Democracy Project*, 498 F. Supp. 3d at 139–40. A substantial delay in the production of Defendant SSA's records pertaining to USDS access would preclude the public "'from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of' a high-profile government action." *CREW*, 2025 WL 752367, at *13 (quoting *Protect Democracy Project*, 263 F. Supp. 3d at 299). USDS's access to Defendant SSA's systems continues to be "the subject of a currently unfolding story." *Brennan Ctr.*, 498 F. Supp. 3d at 98 (quoting *ACLU*, 321 F. Supp. 2d at 30).

Lastly, the Request clearly concerns federal government activity. Defendant SSA is a federal government agency, *cf. Protect Democracy Project*, 498 F. Supp. 3d at 140 (U.S. Postal

Service and Department of Justice), and USDS's operations are also federal government activity, *CREW*, 2025 WL 752367, at *13.

## II.  The ACLU Will Suffer Irreparable Harm Absent Preliminary Relief

To demonstrate irreparable harm, the party seeking a preliminary injunction must make two showings: "First, the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm. Second, the harm must be beyond remediation." *League of Woman Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (cleaned up).

The ACLU has already suffered great and actual harm from Defendant SSA's violations of FOIA. The ACLU's work in "[o]btaining information about government activity, analyzing that information, and widely publishing and disseminating it to the press and public," Wessler Decl. Ex. A at 5, frequently relies on information obtained through FOIA, especially when concerning government operations shrouded in secrecy, as is the case here. Without expedited processing of the ACLU's Request, the ACLU's "ability to inform the public of ongoing proceedings of national importance" is hampered, *Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019); *see also Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017) ("District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate."); *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) (noting that the plaintiff would suffer irreparable harm because it would be precluded "from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program"). The Request is time sensitive due to the constant developments in USDS's actions, for the same reasons that there is an urgency to inform the public. *See supra* Argument I.B. And as this Court noted in

*CREW*, "USDS's actions to date have proceeded remarkably swiftly," and "the rapid pace of USDS's actions" requires a quick release of information. 2025 WL 752367, at *15 ("USDS appears able to do this in part because of its access to many agenc[ies'] IT systems, which help the department carry out its objectives at warp speed."). This need for timely information can also be seen with events that have occurred since the Request and appeal[16]—there continues to be active press coverage of USDS and Defendant SSA.[17] And that press coverage generally raises far more questions than it can answer, given the paucity of information available from SSA and USDS. *See, e.g.*, Kornfield et al., *supra* ("It is not clear whether DOGE . . . violated the court order with its

---

[16] In assessing irreparable harm and the other preliminary injunction factors, courts are not limited to information available at the time of the agency's determination and may consider events that have transpired after. *Protect Democracy Project*, 263 F. Supp. 3d at 300.

[17] *See, e.g.*, Stephen Fowler & Jenna McLaughlin, *DOGE Says It Needs to Know the Government's Most Sensitive Data, but Can't Say Why*, NPR (Mar. 26, 2025), https://perma.cc/M9XM-3X4N; Makena Kelly, *DOGE Plans to Rebuild SSA Code Base in Months, Risking Benefits and System Collapse*, Wired (Mar. 28, 2025), https://perma.cc/V7MT-S5RK; Beatrice Nolan, *Elon Musk's DOGE Is Undermining the Social Security Administration's Technology and Operations, Former White House Official Says*, Fortune (Apr. 1, 2025), https://perma.cc/6LVN-CJ83; Lorie Konish, *Trump Administration's Appeal of a Temporary Restraining Order Preventing DOGE Access to Social Security Data Is Denied*, CNBC (Apr. 2, 2025), https://perma.cc/8XC7-RSEW; Michael Sainato, *Doge's Attack on Social Security Causing 'Complete, Utter Chaos,' Staff Says*, Guardian (Apr. 6, 2025), https://perma.cc/2XTR-QJK3; Lisa Rein, Hannah Natanson & Elizabeth Dwoskin, *Social Security Website Keeps Crashing, as DOGE Demands Cuts to IT Staff*, Wash. Post (Apr. 7, 2025), https://perma.cc/T8CV-DSLT; Stephen Fowler & Jude Joffe-Block, *How DOGE May Have Improperly Used Social Security Data to Push Voter Fraud Narratives*, NPR (Apr. 11, 2025), https://perma.cc/3XDC-FDJZ; Jackie Velez, *DOGE Changes at the Social Security Administration Draw Lawsuit from Disability Advocates*, Tex. Pub. Radio (Apr. 14, 2025), https://perma.cc/N7K2-RBS9; Daniella Genovese, *Social Security Administration Launches Anti-Fraud Measures*, Fox Bus. (Apr. 14, 2025), https://perma.cc/T5UR-RGY6; Lorie Konish, *Court Blocks DOGE Access to Sensitive Personal Data at Social Security Administration*, CNBC (Apr. 21, 2025), https://perma.cc/V9A4-MHD8; Meryl Kornfield, Lisa Rein & Hannah Natanson, *When Government Thinks You're Dead, It Upends Lives. DOGE May Make It Worse.*, Wash. Post (Apr. 23, 2025), https://perma.cc/MN48-A5ZA; Robert Tait, *Former US Social Security Head Predicts 'Interruption of Benefits' Amid Doge Cuts*, Guardian (Apr. 25, 2025), https://perma.cc/LDV6-7G8Q; Nate Raymond, *US Appeals Court Will Not Allow DOGE to Access Social Security Data*, Reuters (Apr. 30, 2025), https://perma.cc/W3M4-H9KZ.

actions."); Fowler & Joffe-Block, *supra* ("That leaves many questions still unanswered about the Social Security data behind DOGE's claims.").

"The Supreme Court has observed that a public informed about its government's actions is 'a structural necessity in a real democracy.'" *Brennan Ctr.*, 498 F. Supp. 3d at 101 (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)); *CREW*, 2025 WL 752367, at *14. And "[*t*]*imely* awareness is equally necessary because 'stale information is of little value.'" *CREW*, 2025 WL 752367, at *14. Thus, "courts have concluded that a delay in processing of a FOIA request would cause irreparable harm" in FOIA cases involving "ongoing proceedings of national importance." *Brennan Ctr.*, 498 F. Supp. 3d at 101; *CREW*, 2025 WL 752367, at *14. This is one of those cases, as evidenced by the continuing public debate and news coverage.

The secrecy around USDS's operations within Defendant SSA further increases the need for timely information. *CREW*, 2025 WL 752367, at *15. Even members of Congress continue to be left in the dark.[18] Irreparable harm continues with each day that USDS is meddling in Defendant SSA's operations through accessing their systems. *Cf. Ctr. for Public Integrity*, 411 F. Supp. 3d at 13 ("[I]rreparable harm is already occurring each day the impeachment proceedings move forward without an informed public able to access relevant information.").Voters who "seek to influence congressional representatives to take action responsive to USDS at any point along the road" require information to be released immediately. *CREW*, 2025 WL 752367, at *15.[19]

---

[18] *See, e.g.*, Sahil Kapur & Julie Tsirkin, *Top Republicans Say They're Out of the Loop as DOGE Downsizes Social Security Administration*, NBC (Mar. 26, 2025), https://perma.cc/ZD69-KUD5; Meryl Kornfield, *Senate Democrats Ask for Answers from Inspector General on Social Security Cuts*, Wash. Post (Apr. 23, 2025), https://perma.cc/38VR-TSPC.

[19] *See also, e.g.*, Hannah Natanson & Lisa Rein, *Social Security Abandons DOGE-Led Phone Service Cuts Amid Chaos, Backlash*, Wash. Post (Apr. 9, 2025), https://perma.cc/5D2Q-3H8A.

### III.    The Remaining Factors Strongly Favor the ACLU

The remaining two preliminary injunction factors—balance of equities and the public interest—weigh heavily in the ACLU's favor. "Where the federal government is the opposing party, the balance of equities and public interest factors merge." *Protect Democracy Project, Inc.*, 498 F. Supp. 3d at 137. In practice, a court analyzing these two factors together "must carefully balance the equities by weighing the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024).

An injunction would facilitate "citizens' right to be informed about 'what their government is up to.'" *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed," *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978), and "[i]n a functioning democracy, an informed electorate always inures to the public benefit." *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 15; *Ctr. to Prevent Handgun Violence v. U.S. Dep't of Treasury*, 49 F. Supp. 2d 3, 5 (D.D.C. 1999) ("There is public benefit in the release of information that adds to citizens' knowledge" about the activities of their government.).

Likewise, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (citation and quotation marks omitted); *see also Loving v. IRS*, 917 F. Supp. 2d 67, 81 (D.D.C. 2013).

In contrast, by definition, "the government cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 195 (D.D.C. 2021) (citations and quotation marks omitted). And to the extent Defendant SSA are burdened by having "to process and produce these records quickly, and

fac[ing] substantial backlogs, their burden is outweighed by the [plaintiff]'s pressing need for the information and the public interest in being informed on a matter . . . that is of 'the highest national concern.'" *Brennan Ctr.*, 498 F. Supp. 3d at 103.

## IV.    This Court Should Waive the Bond Requirement

Finally, the Court should waive the requirement for the ACLU to post a bond. *See* Fed. R. Civ. P. 65(c). Trial courts possess broad discretion under Federal Rule of Civil Procedure 65(c) in determining whether to require security. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). This includes discretion "to dispense with any security requirement whatsoever where the restraint will do the defendant 'no material damage.'" *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). Here, a preliminary injunction will not materially damage SSA, as it would simply require it to fulfill its already existing obligations under FOIA.

## CONCLUSION

For the foregoing reasons, the ACLU requests that this Court issue a preliminary injunction requiring Defendant SSA to immediately process the ACLU's FOIA request and produce all non-exempt records on an expedited basis. The ACLU additionally asks that, in light of the extraordinary public interest and the urgency to inform the public, the Court order Defendant SSA to process potentially responsive records at a rate of no less than 1,000 pages per month, as this Court has ordered as to USDS and the Office of Management and Budget in *CREW*. Minute Order, *CREW*, No. 25-cv-511 (D.D.C. Apr. 10, 2025). Alternately, the ACLU asks the Court to order the parties to confer about a reasonable processing schedule, and to submit a joint letter setting out the parties' positions for consideration of the Court.

Respectfully submitted,

/s/ Megan C. Keenan

20

Megan C. Keenan (DC Bar No. 1672508)
Michelle Fraling (DC Bar No. 90017463)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
915 15th Street NW, 6th Floor
Washington, DC 20005
(917) 710-3245
mkeenan@aclu.org
michelle.fraling@aclu.org

Lauren Yu*
Nathan Freed Wessler*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lyu@aclu.org
nwessler@aclu.org

Evelyn Danforth-Scott*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
edanforth-scott@aclu.org

*Counsel for Plaintiff*

* Admitted *pro hac vice*

Dated: May 7, 2025